Number 152227 Gustavo Alberto Corrado-Arriaza v. Loretta Lynch Good morning, Your Honor. May it please the Court? I'm jumping in for the petition of Gustavo Alberto Corrado-Arriaza. If I may, I'd like to request two minutes for a rebuttal. Yes, you may have it. Thank you, I appreciate it. Thank you, Your Honor, for the opportunity to be heard. The issue presented in this case is in regards to whether or not the immigration judge erred in denying the petitioner's motion to the President to terminate proceedings as a result of our inability to present a prima facie case of an egregious violation of the Fourth Amendment in the petitioner's lawful arrest and seizure, Your Honor. Just a brief recitation of the facts. The incident will be released on the specific date of February 27, 2013. This is the same day the notice here was issued, in which removal ruling was also charged. During this incident, at approximately 10 a.m., four ICE officers who were armed met with the... Counsel, I think you really waste your time if you go through the facts. We know the facts. Why don't you get to your legal argument? Thank you, Your Honor. Well, the issue essentially has to do with the attendant circumstances in relation to the actual arrest. Can you define for us, please, on appeal, what you think the legal issues are before the court? Of course. Our position is essentially that an egregious violation was set out, a prima facie case was made, in fact, based upon the racial motivations for the arrest, where there was no reasonable suspicion. Where do you get this notion of racial motivation? There's no suggestion of that in the declaration that your client filed. That seems to be a gloss that you've put on the case on appeal. What is the factual basis in the record of that claim? Well, essentially, the factual basis, Your Honor, is based upon the fact that immigration officers came to execute a search warrant upon an individual by the same first name, Gustavo Gomez. Once that mistaken identity was established, there was no other reason, but for the reason that this individual petitioner had the same first name, and this is also established in a matter of tort in the 1980 BIA case, which established that an appearance or last name would constitute, an arrest based upon those things would constitute an egregious violation. There was simply no reason for this petitioner to have been unlawfully detained. What actually happened here? I mean, he, once it's clear that, or it appears to be clear that he's not the individual they were seeking, they asked for some form of identification, he hands them his license, which is a Guatemalan license, and then they proceed to handcuff him. Now, there are reasons to be concerned about that, but what makes that sequence racial? Well, there was no reason. You can have a Guatemalan license and not be an undocumented alien for them to pursue for an arrest and lawful detention, particularly with the restraint of liberty with the handcuffs. That was prolonged. The mistaken identity was established prior to his arrest, and it continued on beyond that in further inquiry in regards to his last name, his date of birth, his children, and also with the photograph. The declaration states essentially how the petitioner overheard these ICE officers who established by their own mission that there was not a match in regards to the petitioner and also inquiries as to what to do with this individual. Logically, there would be no other conclusion to determine that he was a lawfully present in the United States, but for the fact that he had the same coincidental first name and had an appearance of a stamped name or descent. And this is, again, like I mentioned, solidified in the 1980 BIA case in Manitouro, but also in another case in which the Supreme Court held in the United States versus Bermuda Ponds in 1975, where the officers believed that the detainees were of Mexican descent could not justify the reasonable belief that they were aliens. So let's assume that we were to agree with you that the circumstances were egregious here. What would justify extending the suppression to the I-94 document, which is a document that was in government files at least seven years before this incident occurred? It certainly is not a document that was acquired contemporaneously with the events that you're describing. So what would justify extending the suppression to that? Thank you. I would agree with that. Actually, the I-94 was actually obtained with the passport that was provided subsequent to the arrest. And it's that basis of that unlawful seizure that the suppression should be extended. Although the government had the I-94, that would be essentially stating that Customs and Border Patrol, ISDHS, they would have essentially gone through the thousands of I-94s to determine that this individual, Mr. Gustavo Corrado Arreaza, was here unlawfully. There was no challenge either before the IJ or the BIA to the fact that the I-94 was independently obtained by the government agent who was going to prosecute this case. He found it on record and he used it. Are you now trying to change the facts of the case? No, I'm not, Your Honor. My apologies. I'm stating that the Department of Homeland Security essentially was able to locate the I-94 after the passport was provided to the ICE officers on that day in question, Your Honor. But that in itself is the reason why. It's not an issue of whether or not the I-94 could have been independently obtained, but whether it was or wasn't, and in this case it wasn't. The I-94 wasn't obtained, again, through a search of the I-94s of the Customs and Border Patrol. Rather, it was a situation in which the passport, which had an I-94 in there, the first page of the passport, was provided. So that is the distinguishing factor in my view as to the reason why this question should be extended in that matter. Suppose the police, in a normal law enforcement situation, unlawfully, in violation of the Fourth Amendment, arrest someone, bring them into the station, get their name, and it's a crime where the person's address or claimed address is relevant, and the police go and grab a phone book and open it up and look to see where the address and phone number is. Would we suppress that? And if we wouldn't, how does something about these immigration forms and the file containing them differ from that phone book? Well, the difference in that situation would be that it's because there was an unlawful arrest. So it's fruits of the poisonous tree in which it was recognized as... So you're saying the phone book would be fruits of the unlawful? I would be saying that the address that was provided, if an address was provided by the defendant... No, no. The defendant said nothing. They just went out and arrested someone who they shouldn't have arrested. All they knew was his name. Well, then my position, Your Honor, would be that that wouldn't be feasible. The DHS would not be able to look at that and, of course, specifically solely on a name or date of birth. So I don't believe that that would be analogous in this case, Your Honor. So you're saying there's some basis in the record to say that with just his name as opposed to the showing of the passport, they couldn't have found the form and we should therefore say that although the name is not suppressible, the showing of the passport would be? Yes, I believe that's what would be my position, Your Honor. That's in regards to the, again, that's going back to the independent, whether or not there was an independent basis for the DHS to actually obtain this. And the record reflects that this was based specifically after the unlawful arrest, which resulted in the I-94 passage of the information. This is distinguishable also in regards to the Garcia Aguilar case that this Court decided in that there was the Garcia Aguilar case had to do with independent third parties, independent militia of information versus one here where there wasn't any type of, this was based off of the actual seizure. It wasn't a passiveness that was in the Garcia Aguilar case where the Mexican consulate acted on its own militia, Your Honor. This is a case in which the Department of Homeland Security relied upon information that was obtained through an unlawful seizure that provided that linkage. Counsel, may I ask you, what are the, so have you thought through the implications of the decision that you're asking us to make by that? I mean, there's no dispute here about the identity of your client. There's no dispute about the fact that he, by a matter of years, as I understand it, as you said, there's no question about the fact that he is here illegally. Are you saying that if there were suppression that extended as far as the I-94, that that would somehow give him a free pass to remain in the country? Is that what you're arguing for? My position is whether there is such an egregious violation of the Fourth Amendment, then that is the proper remedy. And there is a proper remedy. Suppression of the entirety of the documents that need determination in this case. And thereby making him immune from any further proceedings that might lead to his deportation? Well, there's alternative means for an individual to become removable, Your Honor. For example, if the petitioner had committed another offense, I'm not saying that this individual wouldn't be able to be charged as removable by this same section for being unlawfully present. But the means of discovering that he was unlawfully here is what should have been suppressed. And I believe that's the appropriate remedy in a case where there is an egregious violation. The egregious violation here is not only because of the racial motivation, but because of the attendant circumstances here of how this information was obtained. He was led into a 15-by-15 room where the one and only entry was blocked by two ICE officers. There's a machina waiting. Counsel, the Supreme Court case on which you're relying said, gee, maybe there were some occasions where the violation of Fourth Amendment rights was so egregious that we might rethink the rule that the Fourth Amendment exclusionary rule does not apply to civil immigration proceedings. Do you have any reason to think that the Supreme Court will adopt the rule that you are now asking us to rule on? Your Honor, I'm not proposing a change in existence. Yes, you are. I don't believe so. The Supreme Court alluded to a possible exception. It did not say what it would do if there was actually such an exception. Do you have any case law where anybody has followed the remedy that you are now suggesting? Yes, Your Honor. Suppression was deemed an appropriate remedy, and how so on multiple occasions where there's such an egregious violation. Your Honor, I believe, if I may just have a brief moment, my apologies. My apologies, Your Honor, but in other circuits where, if I may answer that question. Is it in your brief? Yes, it is. All right. We'll rely on that. Thank you. Thank you. You've reserved too many. Thank you. May it please the Court. My name is Lindsay Glenner, and I represent the government. The agency properly denied Mr. Quarto's motion to suppress and terminate his proceedings for two reasons. First, Mr. Quarto failed to demonstrate a prima facie egregious Fourth Amendment violation. And second, he failed to demonstrate that any of his alleged regulatory violations provide a basis for suppression or termination. I thought there was also the independent source rule here. Correct, Your Honor. Could you focus your arguments on that, please? Because the ubiquity of this form, which became available to counsel as the deportation proceedings were being prepared for, if it's an independent source, then the question arises, so if the government is always going to win on the independent source rule, does this somehow undercut adherence to the Fourth Amendment? Is it going to encourage violations of the Fourth Amendment? Now, the Supreme Court, in its decision, had a whole lot of discussions about why it didn't think that would happen. But you're going to have to address that question in this case. And then address the second question about is some sort of arbitrariness involved in the cases where the government has evidence that someone has entered legally, but only for a given period of time, versus people who don't enter legally and the government has sort of no evidence as to how it is they entered. Okay? Okay, Your Honor. I'll address your first question first. In this case, the government did not exploit the assumed illegal arrest or seizure in this case because the I-94 was already in the government's possession prior to Mr. Crotto's 2013 encounter with the ICE agents. So although the I-94 was not, I guess, at the attention, in the government's attention, it was still within the government's possession. And at the time of the ICE, counsel for ICE, obtained Mr. Crotto's identity. Counsel, I just, I'm not, I gather what you're saying, that merely having his name, forget about the passport, and whatever was in the passport in the form of a part of the I-94, the very fact that you have his name is all that you would need in this day and age with everything being computerized to immediately get access to that I-94. Is that correct? I can't specifically address how, what information the ICE officer used, I mean, excuse me, the ICE counsel used to obtain this document. What he stated on the record is that once he obtained Mr. Crotto's identity, he contacted the Customs and Border Protection at the airport and obtained the I-94 that had been in their computer system since he was admitted to the country in 2005. At that time, Petitioner's Counsel did not object to the statement, did not ask for more information as to what specific identity information was necessary to obtain that document. It was just left at that. And that was the end of the government's proffer as to how that information, how that document was obtained. Because the document was in the government's possession, the ICE counsel did not exploit the illegal arrest or seizure to obtain that document. And so I think because of that, it's distinguishable from other cases where the objective evidence is come to after the illegal arrest or seizure. With respect to your second question about the inequity and the fact that there is evidence that Mr. Crotto is illegally in the government, illegally in the country, I think that's, it's a very difficult question to answer because that is really just based on how he entered the country. And I don't know if it puts him in a worse position because the fact remains that he is illegally in the country. He was permitted to be in the country for six months and he's overstayed that time. Counsel, for the lack of the presence of this I-94 document in the records of the government, given your independence requirement for someone who enters the country legally, like the petitioner did here, what, if anything, is left of the sort of egregious circumstances, the exception that the Supreme Court noted in 1984? It seems like in every instance, no matter how egregious the circumstances of an arrest might have been, the government can just, if it has the identity information, can simply get the I-94 and say whatever the circumstances might have been at the time of the arrest, they don't matter because we have this independent source. And related to that, somewhat perversely, someone who entered the country illegally, and so there was no comparable I-94 documentation, might be in a better position to argue suppression on the basis of egregious circumstances because the identity information and evidence of alienation might only come from things that that individual said at the time of the arrest or documents that were related to the arrest. So there seems to be, if you succeed in arguing independence, we'll see if it has that kind of perverse result. And, you know, in Inez versus Lopez Mendoza, the Supreme Court addressed that sort of fact, that in most cases, when they were assessing the deterrent effect of using exclusionary rule in civil deportation proceedings versus the cost of it, they specifically noted that in most cases, the government's going to have another way to establish the person's illegal presence in the country. So the deterrent effect of using exclusionary rule was really low because of that fact. I mean, that was just one of the factors that they considered. But it is a fact, and I don't know how we can change that. I think in this case, the agency really used independent source doctrine solely as an alternative argument. They first addressed the egregiousness, and maybe if the egregious factors were so severe, the court would not get to the independent source doctrine. I mean, that's solely speculative because we don't have that in this case. But in this case, the board found there was no egregious violation and then alternatively went to the... Well, in INS versus Mendoza, the Supreme Court goes over the INS history and finds that, in fact, there are very few claims made of egregious Fourth Amendment violations that the agency had to deal with, much less courts. In the years since then, how many years has it now been? I think it was in the 80s. Is the claim made very often before the agency of egregious Fourth Amendment violations? And if so, do they happen in a particular category of cases? What do you know about the first question? In my personal experience, I was a clerk at an immigration court right out of law school and I saw one suppression case while I was there. Here at OIL, and I've been there for about 10 years, we see very few of them. And that could be for many reasons. One, that some of these cases, if they're raised before the immigration judges, the immigration judges do terminate proceedings. Or it could be that the issue just isn't really raised very often. With respect to your second question, Judge Lynch, could you repeat it? Does the issue come up in a particular category of cases? I've not seen a particular category. I mean, just in, you know, the second... Other circuits have published cases on the exclusionary rule of the second, the third, and the fourth that I can come to mind, and all the circumstances are very different. Some are workplace raids, some are home evasions, some are... I think it just... I think it differs. I don't think that there's one fact pattern that comes up the most in these cases that I'm aware of. So the fact pattern here is they actually have someone they're looking for who works in a kitchen in a restaurant. Not unusual in New England to have someone who is undocumented or has overstayed to be working in a restaurant. They find out that... So I take it it's not unusual in New England to go look for an undocumented alien at a restaurant. I can't speak to the commonality of this, but I would say in this case that there's no dispute that he had a restaurant for a particular person, and this particular person formally worked at the restaurant and just happened to share the same first name as the petitioner in our case. So it wasn't like they were just randomly going to restaurants looking for undocumented aliens. It was that in this case they had an arrest warrant for a specific alien, and that brought them to the petitioner in our case. I want to ask you, there's a lot of talk in the briefing about the regulations that seem to prescribe the way in which enforcement agents should conduct themselves in making the kind of inquiry we saw here and then perhaps a subsequent arrest, and your briefing suggests that even if the regulations are violated, there will be no repercussions from that violation. They're not for the benefit of somebody in the petitioner's position. No relief can be asked for on the basis of it. So do those regulations have any determined value at all in affecting how agents should conduct themselves when carrying out these enforcement responsibilities? And I didn't mean to imply that the agents are not intended to comply with the regulations. The regulations specifically state that there are standards of operating procedures for law enforcement officers, and it states that the law enforcement officers are to file the regulations. Also, the regulations specifically provide that if there's any violations of the regulations, that those violations are to be reported to the Office of Inspector General. And then there's a whole procedure that the Office of Inspector General goes through with reviewing those violations. So there are perhaps internal repercussions, is that correct? Without a doubt, Your Honor. Correct. The regulation was not intended to provide aliens with benefits that did not already exist. So they can challenge their arrest and their seizure under the Fourth Amendment. They just can't challenge those based on the regulations. The regulations don't provide them a benefit in terms of suppressing or terminating evidence based on a regulatory violation. And have there, in fact, been references to the Inspector General's office? References in which way, ma'am? Of claimed egregious violations by agents. I did not research that. I assume that there have been through the years, just based on the fact that we see all these published cases discussing this issue. I would assume that there have been investigations, but that is solely based on speculation, Your Honor. Counsel, in a situation where an individual is arrested on the basis of evidence that the individual is in the country illegally and removal proceedings begin, does the government have the initial burden of establishing both identity and alienage of a lone individual? Is that the government's initial burden in a proceeding such as that? It depends on the charge, Your Honor. But in this case, the government did have the burden to establish by clear and convincing evidence that he was illegally in the country and that he had essentially overstayed his visa. In a situation where somebody went into the country illegally, isn't it possible that much of the evidence of alienage would come from perhaps the circumstances of an arrest, something that the individual said during that arrest or some documents that were obtained during that arrest? Are you speaking about a circumstance in which someone just crosses over the border illegally? That's correct. That's right. Came into the country. So in that situation, the charge would be different. He would be charged as someone who's present without inspection. And in that case, the burden's a little different. In that case, the government just has to show his identity and evidence that he's not from the United States. And then the alien has the burden to rebut that and to present evidence that he's actually legally in the country. So the burden in those cases is a little different than what we have here. Did that address you? If the court doesn't have any other questions, we'll ask that the government deny the petition for review. Thank you. Thank you. You've reserved two minutes. Thank you. I appreciate it. Respectfully, in regards to the burden of standing removability, that is something that always rests with the Department of Homeland Security in regards to that one issue. That's the independent source. The issue for me would be whether or not that same day in which the notice to appear was issued, was there some type of intervening circumstance that was so attenuated that it would remove the tape from the egregious conduct of a lawful arrest. And in this case, there wasn't that I could see. In fact, the egregiousness is actually further demonstrated by the violations of those regulations. While they don't create any substantive procedural due process rights for the petitioner or anyone in these matters, the Board of Immigration Appeals in the matter of Garcia Flores' 1980 case held that where such regulations are violated, it has an effect on the fundamental fairness of the actual hearing, and thereby affecting the due process of the actual case of removability. That's why I think that there should be an extension of the exclusionary rule to pass on through this matter, Your Honor. For all those reasons, Your Honor, I do believe that at the very minimum, the immigration judge erred in looking at whether the immigration judge looked at whether or not there was any type of egregious conduct based off of the testings and that was, and whether or not there was any type of physical threats or any type of abuse. In this case, it's implied and inherent in the factual circumstances and the attendant circumstances of a lawful arrest that there was some type of coercion. That was the guidance that we were given in the matter of Toro or any type of racial motivation or any type of unjustification for the lawful arrest, and that's why I believe that that should have been suppressed. Thank you, Counselor. Thank you. I appreciate it.